Floyd JOHNSON, Individually and in his capacity as Personal Representative of the Estate of Mabel Lucille Johnson, Appellant,

v.

HOOSIER ENTERPRISES III, INC. f/k/a Hoosier Health Systems, Inc. and Delmar Limited Partnership, d/b/a Canterbury Village, Appellee.

No. 49A02–0402–CV–209.

Court of Appeals of Indiana.

Sept. 30, 2004.

H. Kennard Bennett, Severns & Bennett, P.C., Indianapolis, IN, Attorney for Appellant.

Richard B. Kaufman, Esq., Stark Doninger & Smith, Indianapolis, Thomas R. Schultz, Schultz & Pogue, LLP Carmel, IN, Attorneys for Appellee.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Floyd Johnson, individually, and in his capacity as Personal Representative of the Estate of Mabel Lucille Johnson (collectively "Johnson"), appeals from the trial court's order granting summary judgment to Hoosier Enterprises III, Inc., f/k/a Hoosier Health Systems, Inc. ("Hoosier").

We reverse.

### ISSUE

Whether the trial court erroneously granted summary judgment to Hoosier Enterprises III, Inc.

### FACTS

In March 1998, Mabel was admitted to a health facility known as Canterbury Village, located on East Raymond Street, Indianapolis, Indiana. On April 8, 1999, while Mabel was eating in the dining room at Canterbury Village, she choked on a piece of food and lost consciousness. Mabel was transported to the hospital; however, she died on April 18, 1999.

Johnson, her widower, was appointed personal representative of Mabel's estate. On July 31, 2000, Johnson filed a complaint against Delmar Limited Partnership, d/b/a Canterbury Village, for wrongful death and loss of consortium. The Chronological Case Summary ("CCS") reveals that the summons for Delmar was served by certified mail on August 2, 2000. "[S]ervice of process was … made upon John Bartle, Res. Agt. 421 S. Walnut Plaza, Muncie, IN 46305." (Appellee's App. 1). Bartle is a limited partner of Delmar and the president of Burlington, Inc., the sole general partner of Delmar. The CCS reveals that Delmar did not appear in the action filed by Johnson.

At some point thereafter, Johnson learned that Delmar had filed for bankruptcy on November 6, 1998. (Appellant's App. 104, Appellee's App. 47). On July 16, 2001, the Trustee in Delmar's bankruptcy agreed to a stipulated motion for relief "from the automatic stay provided by 11 U.S.C. § 362 … to allow Floyd Johnson to continue to prosecute his civil action for personal injuries against" Delmar because it appeared that Delmar was insured at the time. (Appellee's App. 42). Pursuant to the order modifying the stay, Johnson was allowed to pursue his claim against Delmar, "but only up to the limits of the Debtor's insurance coverage applicable to said claim." (Appellee's App. 46). Johnson was awarded a default judgment against Delmar on August 16, 2001.

In the course of conducting discovery, Johnson learned that at the time of Mabel's injury and death, Canterbury was "operated" by Hoosier through a Facility Management Agreement ("FMA"). (Appellant's App. 91, 105). On November 12, 2001, Johnson deposed John W. Bartle. Bartle attested that Delmar ceased its operation of Canterbury Village on May 31, 2000 when an entity named Beverly Enterprises LLC became owner, that Hoosier was the management company for Canterbury Village at the time that operations were transferred to Beverly, and that Canterbury Village was no longer in operation. Further, Bartle stated that "[i]t was the responsibility of the management company

[Hoosier] to provide for all forms of insurance under the terms of the management agreement." (Appellant's App. 171). Bartle stated that he believed that Hoosier had liability insurance for the facility, naming Delmar as a secondary insured, "from the inception of the management agreement, January 1st of 1997, through Hoosier's management of the facility and Delmar's occupancy of the property, which concluded as of May 31st 2000." (Appellant's App. 174).

On December 4, 2002, pursuant to a motion to compel by Johnson, the trial court ordered Hoosier, as a non-party, to produce certain documents disclosing its relationship to Delmar. In a notice of compliance dated January 3, 2003, Hoosier objected on the basis that the relationship was disclosed in the Delmar bankruptcy proceedings and was available to Johnson; however, Hoosier produced the FMA "between Hoosier and Delmar," executed on January 1, 1997. (Appellant's App. 31, 39–53). The lease term for Canterbury Village was listed as five years, thereby encompassing the time period at issue here.

The FMA required, *inter alia,* that 1) "[a]ll personnel employed at the facility shall be the employees of" Hoosier; 2) Hoosier "shall maintain in its own name during the Term, all licenses, permits and certificates required for the management and operation of the Facility . . . ."; and 3) Hoosier shall indemnify Delmar from "any and all claims, demands, obligations, losses, liabilities, damages, recoveries and deficiencies . . . which any of them may suffer as a result of any default by [Hoosier] in the performance of any of its commitments, covenants or obligations under this Agreement, or with respect to any claims, damages, liabilities, suits, arbitration proceedings, administrative actions or investigations which relate to the operation of the facility or any of the obligations assumed by [Hoosier] herein from the Commencement Date and continuing thereafter." (Appellant's App. 109–114). Licenses are issued by the Indiana State Department of Health ("ISDH").

With respect to insurance, the FMA provided:

2.15 *Insurance.* During the entire Term, Lessee [Delmar] shall, at its expense, keep the premises insured with the kinds and amounts of insurance described below through an insurance company qualified to do business in Indiana. The policies must name Lessee [Delmar] as named insured or loss payee. Manager [Hoosier] shall pay Lessee [Delmar] one dollar ($1.00) per bed day available for negotiating, advising, accounting and administrating claims and insurance issues and contracts arising out of the delivery of nursing care and other risks related to the properties being managed by Manager [Hoosier]. In addition to the one dollar ($1.00) per bed day charge, Manager [Hoosier] agrees to pay Lessee [Delmar] for all amounts invoiced for various forms of insurance coverages and employee benefits. The one dollar ($1.00) per bed day charge for administration shall be billed monthly and shall be separate and apart from the invoiced amounts of related insurance policies.

2.15.1 Loss or damage by fire and such other risks as may be included in the broadest form of extended coverage insurance from time to time available in an amount equal to the sound insurable value of the building:

2.15.2 Claims for personal injury for property damage under a policy of general public liability insurance in an amount of at least One Million Dollars ($1,000,000) combined limits of bodily injury and property damage per occurrence;

2.15.3 Manager [Hoosier] shall furnish adequate worker's compensation insurance;

2.15.4 Claims for professional liability with coverage in an amount of at least Three Hundred Thousand Dollars ($300,000) per occurrence, and of at least One Million Dollars ($1,000,000) in aggregate coverage; and

2.15.5 Such other coverage or additional amounts of coverage as may be required by the Lessee [Delmar].

(Appellant's App. 112). Also, Hoosier's failure "to obtain and keep in full force and effect the insurance coverage required in Section 2.15 herein" was included as an event of default the FMA. (Appellant's App. 115).[1]

On March 24, 2003, Johnson filed his amended complaint reciting substantially the same information as was asserted in the original complaint. In the amended complaint, Johnson added "Hoosier Enterprises III, Inc. f/k/a Hoosier Health Systems, Inc." as a defendant. (Appellant's App. 36).

On July 29, 2003, Johnson filed his second amended complaint setting out the wrongful death and loss of consortium counts individually against both Delmar and Hoosier. Johnson alleged that:

15. Defendant "Hoosier" pursuant to the above referenced Management Agreement, was to maintain in its own name all licenses, permits and certifications.

16. Defendant "Hoosier" failed to maintain the license to "Canterbury Village" in "Hoosier's" name.

17. Pursuant to the Management Agreement, all personnel at "Canterbury Village" were considered employees of Defendant "Hoosier."

18. By failing to maintain the license to "Canterbury Village" in its own name, Defendant "Hoosier" fraudulently concealed its identity from the public.

(Appellant's App. 56–57).[2] Johnson asserted that he did not learn of the existence of the FMA until November 10, 2001, more than two years after Mabel's death on April 18, 1999. Further, Johnson averred that he did not receive a copy of the FMA until January 2003, after his motion to compel its production.

In September 2003, Hoosier filed its motion for summary judgment asserting that Johnson had failed to file his complaint adding Hoosier as a defendant until after the two-year statute of limitations. Hoosier urged that it had not fraudulently concealed its identity and that it had no identity of interests with Delmar such that a tolling of the statute of limitations had occurred. In support of its motion, Hoosier stated:

The FMA provided that Hoosier Health was to maintain in Hoosier

---

**1.** In a December 10, 2003 deposition of Stuart Reed, president of Hoosier, counsel for Johnson asked Reed if he understood that Section 2.15 of the FMA required Delmar to maintain "certain forms of insurance" and whether Reed had "become aware of facts that led [him] to conclude that Delmar … had not obtained the insurance that it was supposed to under" the FMA. (Appellant's App. 90). Reed equivocated, but then concluded that he could not remember whether Delmar had insurance in place. (Appellant's App. 90–91).

**2.** Johnson had also claimed in his second amended complaint that Hoosier "possessed an identity of interests" with Delmar in the Canterbury facility, an allegation that would implicate the theory of "relation back" and would require some showing of notice to Hoosier in order to avoid the statute of limitations defense proffered by Hoosier. Johnson appears to have abandoned that theory and relies instead upon the theory of fraudulent concealment.

Health's name all licenses, permits and certifications. Accordingly, after the FMA was executed, Delmar retained counsel in an attempt to cause the yearly license for the managed facilities, including Canterbury Village, to be held by Hoosier Health. These yearly licenses are issued by the Indiana State Department of Health ("ISDH"). Despite Delmar's efforts, the ISDH determined that Hoosier Health, as manager, did not hold a licensable interest in, *e.g.*, Canterbury Village. Accordingly Delmar agreed that Hoosier Health would manage the applicable facilities, including Canterbury Village, under Delmar's ISDH license and Medicare and Medicaid provider numbers.

(Appellant's App. 65–66) (citations and footnotes omitted).[3]

As to fraudulent concealment, Hoosier relied, in part, upon its assertions that Johnson did not use due diligence to discover Hoosier's identity because: 1) a letter on file at ISDH stated "that Hoosier Health is the 'operator' of Canterbury Village[ ]"; 2) Hoosier had managed Canterbury Village throughout the year in 1999 and had employed all employees and the administrator at Canterbury Village; thus,

"had plaintiff or his counsel bothered to inquire, any employee at Canterbury Village would have had to answer correctly that his or her employer was Hoosier Health"; and 3) Delmar had filed bankruptcy proceedings in which Hoosier had filed a proof of claim including a copy of the FMA that had become "a matter of public record within the Delmar Bankruptcy." (Appellant's App. 66–67, Appellee's App. 23–24).[4]

Thus, according to Hoosier Health,

> The [Second Amended Complaint] against Hoosier Health is barred as a matter of law by the expiration of the applicable two-year statute of limitations. There is no genuine issue of material fact: there is no "relation back"; there is no "concealment" by Hoosier Health, "fraudulent" or otherwise; and, there is no tolling under any "identity of interest" doctrine. Additionally, plaintiff failed to exercise his own due diligence to timely prosecute this action. There is no just reason for delay. Hoosier Health is entitled to final judgment.

(Appellant's App. 72).

In his response, Johnson filed his designation of evidence and memorandum contending therein that genuine issues of ma-

---

**3.** Hoosier also alleged that because Johnson's original timely complaint "was served upon Delmar in Muncie, and not to the Canterbury Village facility in Indianapolis," it "had *no notice* of the filing of this litigation until after May of 2001." (Appellant's App. 66). As discussed in footnotes 1 and 4, this assertion goes to a claim based upon "relation back" or "identity of interests."

**4.** Hoosier makes both separate and interrelated arguments as to identity of interests and fraudulent concealment. Hoosier set out separately its contention that the concept of identity of interests was inapplicable for four reasons: "First, Delmar and Hoosier Health are entirely separate entities, without any common ownership whatsoever." Second, it is undisputed that Hoosier Health *received no*

notice of the commencement of this action until after May 2001, *after* the expiration of the two-year statute of limitations. As such, and third, application of any "identity of interest" theory would deprive Hoosier Health of its rights to procedural due process. Fourth, and unlike the plaintiff in [*Honda Motor Company, Ltd. v.*] *Parks*, [485 N.E.2d 644 (Ind.Ct.App.1985)], the plaintiff in this case failed to use due diligence to ascertain timely the existence of Hoosier Health as a potential defendant." (Appellant's App. 72) (footnote omitted). Based upon our resolution under the fraudulent concealment analysis, we need not discuss "identity of interests" or the concept of "relation back." Thus, it is of no moment that Hoosier did not receive service of process.

terial fact prevented summary judgment. Johnson argued in general that his action against Hoosier was not barred by the statute of limitations because of the existence of tolling provisions and exceptions to the limitations period. Specifically, Johnson urged that Hoosier "fraudulently concealed its identity" and prevented him or the public from obtaining the information necessary to pursue a claim against it. (Appellant's App. 76).

Johnson asserted that by all indications, Delmar operated Canterbury Village. He urged that despite statutory requirements that one operating a health facility "must obtain a license," pursuant to Indiana Code § 16–28–2–1, and that such licenses were exclusive in that a "license issued under this chapter is not assignable or transferable and may be issued only for the person and premises named in the application," pursuant to Indiana Code § 16–28–2–5, the ISDH license for Canterbury was issued to "Delmar Limited Partnership d/b/a/ Canterbury Village" for the period "April 01, 1999 through March 31, 2000...." (Appellant's App. 84). Johnson also noted that 410 I.A.C. 16.2–3.1–13(n) requires that the license be conspicuously posted for public view within the health facility. Johnson urged that Hoosier "circumvented this law by operating Canterbury Village while falsely indicating to the public, including the plaintiff herein, that Delmar Limited Partnership was the operator." (Appellant's App. 78).

Further, Johnson designated documents related to Mabel's admission to Canterbury, none of which indicated that Hoosier operated the facility. Johnson noted:

 a. There were no signs up in the public area that identified Hoosier Enterprises or Hoosier Health Systems as

the operator of Canterbury Village. Exhibit 2, [Stuart] Reed[5] Depo. Pg. 36–37.

 b. The employees at Canterbury Village did not have Hoosier Health Systems on their nametags; rather, those name tags and paychecks all said simply "Canterbury Village." Exhibit 2, Reed Depo. Pg. 37.

 c. When asked, "Back in 1999 if I walked into [Canterbury Village] do you know whether there would have been any signage or any other evidence of Hoosier Health Systems, Inc. being involved with the operation of Canterbury Village?" Mr. Stuart Reed stated, "I don't believe there would be." Id.

(Appellant's App. 77) (footnote added).

Also, Johnson designated:

 a. Authorization/Consent/Waiver Form. Exhibit 4.

 b. Statement to Permit Payment of Hospital and/or Medical Insurance Benefits to Provider and Physicians. Exhibit 5.

 c. Authorization for and Consent to Skilled Nursing and/or Intermediate Nursing Care. Exhibit 6.

 d. Admission Screening Form for Determining Benefit Period. Exhibit 7.

 e. PCA Pharmaceutical Service Corp. Authorization for Medications. Exhibit 8.

 f. Authorization for Assignment of Benefits. Exhibit 9.

 g. Release Statement of Confidentiality and Authorization to Obtain Medical Information. Exhibit 10.

---

**5.** At the time of the occurrence, and continuing to the time of the summary judgment,

Stuart Reed was President of Hoosier.

h. Patient Trust Fund Authorization. Exhibit 11.

i. Requested Healthcare Decisions. Exhibit 12.

j. [Advance] Directives/Statement Acknowledgement of Resident Rights, Canterbury Village Bed Hold Policies/facility, Cost Lists/Medicare/Medicaid information form. Exhibit 13.

k. Advance Directive Information Acknowledgement. Exhibit 14.

(Appellant's App. 77). None of the above documents disclosed that Canterbury was operated or managed by Hoosier. To the extent that the above documents contained a name for the assignment of benefits, release of information, or any reciprocal duties, only the name of the facility appeared: Canterbury Village.

On February 9, 2004, the trial court held a hearing on summary judgment. On February 18, 2004, the trial court entered summary judgment for Hoosier.

## DECISION

When reviewing a determination on summary judgment, we apply the same standard employed by the trial court to evaluate whether the motion should be granted. *Estate of Spry v. Greg & Ken, Inc.*, 749 N.E.2d 1269, 1272 (Ind.Ct.App. 2001). Summary judgment is appropriate only if the designated evidentiary matter shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Kennedy v. Guess, Inc.*, 806 N.E.2d 776, 779 (Ind.2004);[6] Ind. Trial Rule 56(C). Where the facts material to the proceed-

ings are not in dispute, this court determines whether the trial court correctly applied the law to the facts. *Grant County Comm'rs v. Cotton*, 677 N.E.2d 1103, 1104 (Ind.Ct.App.1997), trans. denied. Summary judgment terminates litigation about which there can be no factual dispute and which may be determined as a matter of law. *Merrill v. Knauf Fiber Glass GmbH*, 771 N.E.2d 1258, 1264 (Ind. Ct.App.2002), trans. *denied.*

Further, a statute of limitations defense is one particularly suited for summary judgment. *Mayfield v. Cont'l Rehab. Hosp. Of Terre Haute*, 690 N.E.2d 738, 740 (Ind.Ct.App.1998), *trans. denied.* It is a question for the court to determine when a cause of action accrues. *Id.*

■ Johnson contends that the two-year statute of limitations for negligence actions does not bar his claim against Hoosier. Johnson urges that Hoosier veiled its role as the operator of Canterbury, then used the statute of limitations to shield itself from liability. Johnson urges that Hoosier's failure to comply with the health facility licensing statutes, and the accompanying ISDH rules creates a genuine issue of material fact as to whether Hoosier fraudulently concealed its existence from the public. We agree.

Indiana's Fraudulent Concealment Statute provides:

If a person liable to an action conceals the fact from the knowledge of the person entitled to bring the action, the action may be brought at anytime within

---

**6.** Hoosier contends that in *Kennedy,* our supreme court altered the standard of review for summary judgment from *de novo* to a deferential standard because the court stated: "On appeal from summary judgment, the reviewing court faces the same issues that were before the trial court and analyzes them the same way, although the trial court's decision is 'clothed with a presumption of validity.'" *Id.* at 779. We do not ascribe to that statement any intention to alter the existing standard of review.

the period of limitation after the discovery because of action.

Ind.Code § 34–11–5–1.

 "Fraudulent concealment is an equitable doctrine that operates to estop a defendant from asserting the statute of limitations as a bar to a claim whenever the defendant, by his own actions, prevents the plaintiff from obtaining the knowledge necessary to pursue a claim." *Doe. v. Shults–Lewis Child & Family Servs.*, 718 N.E.2d 738, 744 (Ind.1999). The doctrine is available to the plaintiff when the defendant "has either by deception or by a violation of duty, concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action." *Id.* at 744–45 (quoting *Fager v. Hundt*, 610 N.E.2d 246, 251 (Ind.1993)). "When this occurs, equity will toll the statute of limitations until the equitable grounds cease to operate as a reason for delay." *Doe*, 718 N.E.2d at 745.

 This court's decision in *Stephens v. Irvin*, 730 N.E.2d 1271 (Ind.Ct.App.2000), *on reh'g.* 734 N.E.2d 1133, *trans. denied.;* is instructive. In *Stephens*, we analyzed Indiana's Fraudulent Concealment Statute and noted:

> There is a split of opinion on this Court, however, as to whether the "concealment" discussed in this statute refers solely to the case where a wrongdoer conceals the cause of action itself, or whether the statute may be applied when concealment or misrepresentation

of the *party* against whom a cause of action has arisen occurs.

*Id.* at 1278. We determined that the doctrine applies to concealment of parties, as well as concealment of the cause of action. *Id.* at 1280–81. Moreover, *Stephens* is illustrative of the principle that the violation of a duty, *e.g.*, the failure to act, can constitute grounds for tolling the statute of limitation under the doctrine of fraudulent concealment.[7]

As distilled, Hoosier contends that at least three sources existed from which Johnson could have discerned that Hoosier operated the Canterbury facility: by reviewing the letter on file at ISDH, by questioning the employees at Canterbury, and by reviewing the filings within the bankruptcy proceedings. However, Hoosier's argument and the designated documentation presuppose that Johnson would have had any reason to make those inquiries when all of the common sources of that information listed Delmar as the "operator" of the facility or only referred to Canterbury Village.

As Johnson asserted, Indiana Code § 16–28–2–1 provides: "A person must obtain a license from the director [Indiana State Department of Health] before the person may *operate* a health facility." (Emphasis added).[8] By statute, the licenses are exclusive to the person and premises licensed: "A license issued under this chapter is not assignable or transferable and may be issued only for the person and premises named in the application." I.C.

---

7. We note here, that neither the statutory definition nor the common law authority regarding "fraudulent concealment" contain a requirement that actionable "fraud" occur prior to application of the doctrine.

8. "Health facility" is defined in Indiana Code § 16–18–2–167. The statute provides, *inter alia*, "(a) 'Health facility' means a building, a structure, an institution, or other place for the

reception, accommodation, board, care, or treatment extending beyond a continuous twenty-four (24) hour period in a week of more than four (4) individuals who need or desire such services because of physical or mental illness, infirmity, or impairment." The parties do not allege and we do not find a statutory definition for "operate" or "operator" in this context.

§ 16–28–2–5. Further, 410 I.A.C. 16.2–3.1–13(n) states: "Each facility shall conspicuously post the license or a true copy thereof within the facility in a location accessible to public view."

The license posted at the facility stated: This is to Certify: That a license is hereby granted by the Indiana State Department of Health to:

DELMAR LIMITED PARTNERSHIP D/B/A

CANTERBURY VILLAGE

To conduct and maintain a 223 BED COMPREHENSIVE CARE FACILITY

In the premises located at 5353 EAST RAYMOND ST INDIANAPOLIS, Indiana

This License is effective for the period April 01, 1999 through March 31, 2000, and is subject to the provisions of IC 16–28. This license shall not be assignable or transferable, and shall be subject to revocation, replacement, or reduction for failure to comply with the laws of the State of Indiana or the rules promulgated thereunder.

(Appellant's App. 84). The license was signed. Under the signature line appeared the following: "This License Must Be Posted In A Conspicuous Place On The Premises." (Appellant's App. 84).

As noted above in FACTS, Johnson signed several documents upon Mabel's admission to the facility in March 1998. All of the admission paperwork signed by Johnson listed only Canterbury Village and made no reference to Delmar or Hoosier.

Within its memorandum in support of summary judgment, Hoosier now readily acknowledges that it was the " 'operator' of Canterbury Village[ ]" during the relevant time period, and in particular, on the date of Mabel's injury—April 8, 1999.

(Appellant's App. 66, Appellee's App. 23). However, Hoosier offers no legal analysis for its failure to disclose to the public that it operated Canterbury Village from the inception of the FMA on January 1, 1997 until May 2000. Hoosier simply asserts through affidavits by its president, Reed, and its counsel that it did not obtain the license to operate the facility because it was unable to do so.

The clear intention of Indiana Code §§ 16–28–2–1 et. seq. is to provide information to the public for quality and safety assurance purposes. Those goals are expanded within the ISDH administrative rules that appear in the Indiana Administrative Code. See e.g. 410 I.A.C. 16.2–3.1–2 (specific requirements for licensing new facilities or facilities after change in ownership, or in "officers, directors, agents, or managing employees or the corporation, association, or other company responsible for the management" of a health facility); 410 I.A.C. 16.2–3.1–3 ("[a] facility must protect and promote the rights of each resident"); 410 I.A.C. 16.2–3.1–4 (oral and written notification of residents' rights must be given by facility upon admission and "available in a publicly accessible area."). In light of the clear intention of the statutes to protect the public through full disclosure of information, Hoosier's inability to obtain the license in its own name and its failure to disclose its existence to the public cannot serve as a barrier to claims against it.

■ Here, Johnson presented evidence that Hoosier failed in its duty to disclose its identity to the public, thereby concealing its identity from anyone "entitled to bring" an action. See I.C. § 34–11–5–1. "The policy in our state is to freely allow amendments in order to bring all matters at issue before the trial court." Stephens, 730 N.E.2d at 1281 ("trial court properly allowed Plaintiffs leave to amend their

complaints and add Stephens as a defendant, despite the running of the statute of limitations."). Thus, genuine issues of material fact prevent the granting of summary judgment to Hoosier.

The trial court's determination granting summary judgment to Hoosier is reversed and the cause is remanded for further proceedings consistent with this decision.

BAKER, J., and FRIEDLANDER, J., concur.