

**FILED**

May 08 2013, 8:10 am

CLERK
of the supreme court,
court of appeals and
tax court

## FOR PUBLICATION

ATTORNEY FOR APPELLANTS:

**GARY P. PRICE**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
RICHMOND COMMUNITY SCHOOL
CORPORATION ET AL.:
**RICK D. MEILS**
**JOHN W. MERVILDE**
Meils Thompson Dietz & Berish
Indianapolis, Indiana


ATTORNEY FOR APPELLEE
INDIANA INSURANCE COMPANY:

**JAMES S. STEPHENSON**
Stephenson Morow & Semler
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| MICHAEL E. LYONS, Individually; | ) | |
| DENITA L. LYONS, Individually; | ) | |
| MICHAEL E. LYONS and DENITA L. | ) | |
| LYONS, as Co-personal Representatives | ) | |
| of the Estate of Megan Renee Lyons, Deceased, | ) | |
| | ) | |
| Appellants/Plaintiffs, | ) | |
| | ) | |
| vs. | ) | No. 89A04-1204-PL-159 |
| | ) | |
| RICHMOND COMMUNITY SCHOOL | ) | |
| CORPORATION d/b/a RICHMOND | ) | |
| HIGH SCHOOL; JOE SPICER; | ) | |
| JEFFREY THORNE; and MAGGIE LaRUE, | ) | |
| in their individual and official capacities, | ) | |
| | ) | |
| Appellees/Defendants, | ) | |

INDIANA INSURANCE COMPANY,                )
                                          )
        Appellee/Non-Party-Respondent.    )
                                          )
                                          )

APPEAL FROM THE WAYNE SUPERIOR COURT
The Honorable Peter D. Haviza, Special Judge
Cause No. 89D01-1006-PL-11

**May 8, 2013**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

Appellees/Plaintiffs Michael and Denita Lyons appeal the trial court's grant of summary judgment in favor of Appellees/Defendants Richmond Community School Corporation and certain school administrators ("RCSC"). The Lyonses' daughter, Megan, was a Richmond High School student with Down syndrome, a medical condition that rendered her "Severely Mentally Disabled." Tragically, Megan choked on a sandwich in the school cafeteria, was deprived of oxygen for fifteen to twenty minutes, and ultimately died at a hospital two days later. The Lyonses sued RCSC under the Indiana Tort Claims Act ("ITCA") and 42 U.S.C. § 1983, alleging RCSC's acts or omissions caused Megan's death. The trial court granted RCSC summary judgment on the issues of compliance with the ITCA's notice provision and contributory negligence as well as on the Lyonses' § 1983 claims.

2

We conclude that summary judgment was inappropriate on the Lyonses' ITCA claims by virtue of the discovery rule: when the Lyonses' cause of action accrued remains a question of fact for the jury to decide. The issue of contributory negligence also should not have been judged as a matter of law. We agree with the trial court, however, that there remains no genuine issue of material fact as to the Lyonses' claims of fraudulent concealment and substantial compliance with the ITCA's notice provision; summary judgment would have been proper on these grounds. We further conclude that summary judgment was appropriate on the Lyonses' § 1983 claims: RCSC did not owe Megan a duty of protection under the special relationship or state-created danger doctrine, and it did not deprive the Lyonses of their due process right of judicial access.

The trial court also granted a motion to quash the Lyonses' third-party discovery requests against Appellee/Non-Party-Respondent Indiana Insurance, RCSC's insurer, and subsequently denied the Lyonses' motion for leave to add Indiana Insurance as a defendant. We conclude that the Lyonses cannot assert a third-party spoliation claim against Indiana Insurance, and therefore, that the trial court did not abuse its discretion in denying the Lyonses' motions. The judgment of the trial court is affirmed in part and reversed in part.

## FACTS AND PROCEDURAL HISTORY

Megan was a seventeen-year-old Richmond High School ("RHS") student with Down syndrome. This medical condition rendered Megan "Severely Mentally Disabled," and as a consequence, she would swallow food without chewing sufficiently and sometimes take successive bites before swallowing. The record reveals numerous factual inconsistencies

3

concerning Megan's supervision and dining needs and RCSC's plan for meeting those needs; however, the evidence most favorable to the Lyonses indicates that RCSC was aware of Megan's eating difficulties and had implemented a plan to accommodate them. This included a policy of cutting Megan's food into pieces and the assignment of a one-on-one paraprofessional to supervise and assist Megan at all times. Tragically, on January 7, 2009, Megan choked on a sandwich in the RHS cafeteria and died from the resulting oxygen deprivation two days later.

The details of Megan's choking incident are also highly contested. But when viewed in favor of the Lyonses, the evidence shows that RHS had three paraprofessionals in the cafeteria on the day Megan choked: Vickie Lett, Cindy DeLucio, and Bill Ryan. Lett had served as Megan's one-on-one paraprofessional for at least two years prior to Megan's death; however, on that day, DeLucio was assigned to Megan during lunch. DeLucio had never before accompanied Megan to lunch, was not aware of Megan's special lunchtime needs, and did not cut Megan's sandwich into pieces as required by Megan's dining plan.

RHS Assistant Principals Jeff Thorne, Joe Spicer, Rusty Hensley, and Rachel Etherington were also on duty in or near the cafeteria on the day Megan choked. When DeLucio realized that Megan was choking, she twice tried to get Assistant Principal Spicer's attention from the hallway outside the cafeteria. Having no success, DeLucio instead summoned Lett from a table ten feet away. Lett proceeded to smack Megan on her back in an attempt to dislodge the food in Megan's throat, but Megan continued to choke. Lett told DeLucio to get help, prompting DeLucio to retrieve Assistant Principal Thorne from nearby.

4

Like Lett, Thorne proceeded to tap Megan on her back several times to no avail. DeLucio next approached Assistant Principal Spicer and told him that he was needed in the cafeteria. She did not tell Spicer that Megan was choking. Spicer went to Megan's side and assisted Thorne in attending to Megan.

Three or four minutes after Megan began choking, Assistant Principal Hensley entered the cafeteria, saw that Megan was choking, and called for a school nurse. Nurse Sharon Provance received the call but was informed only that "Mr. Hensley needs you." Appellants' App. p. 683. RHS has a policy of not relaying detailed emergency information over the radio. As a result, Nurse Provance believed there had been a simple fight and did not rush to the cafeteria. She instead packed up her first aid kit, prepared a bag of ice, and walked. Nurse Provance arrived at the cafeteria ten minutes after she was called.

Upon arriving on the scene, Nurse Provance quickly assessed Megan's condition and instructed Assistant Principal Spicer to call 911. At this point, approximately thirteen minutes had passed since Megan began choking. Nurse Provance performed back blows, finger sweeps, and the Heimlich maneuver on Megan, efforts that produced a tennis ball-sized clump of food from Megan's mouth and esophagus. Megan's airway, however, remained blocked, and, by the time a second RHS nurse, Deborah Stracener, arrived on the scene, Megan's heart had stopped. Nurse Stracener joined Nurse Provance in performing CPR on Megan. Three minutes after 911 was called, EMTs arrived and intubated Megan to restore her airway. She was taken to Reid Hospital in Richmond and then transported to Riley Children's Hospital in Indianapolis, where she died on January 10, 2009.

5

Megan was without oxygen for approximately fifteen to twenty minutes. RHS did not have a policy or procedure in place for responding to choking emergencies, and it did not provide its paraprofessionals with training in basic first aid, CPR, or the Heimlich maneuver. None of the individuals that first responded to Megan's aid performed the Heimlich maneuver or called 911.

RHS cafeteria worker Rhonda Swearingen witnessed Megan's entire choking incident. Food Service Coordinator Margaret LaRue, however, was off-campus at the time, returning only in time to see the EMTs removing Megan from the cafeteria. LaRue has no personal knowledge of what happened in the cafeteria that day, and Swearingen never told anyone with RCSC what she had seen.

Soon after the incident, Principal Barbara Bergdoll and LaRue held a meeting with Swearingen and the school's three other cafeteria workers to discuss HIPAA privacy laws and RCSC confidentiality policies. Twice that year, LaRue had conducted similar meetings with her staff. LaRue told the workers they would be fired on the spot if they spoke about Megan's choking incident outside of RHS. LaRue pointed at Swearingen when she made this statement.

Principal Bergdoll held a second meeting on the afternoon of Megan's choking incident, at which school administrators "did a recap of what happened in the cafeteria" that day, Appellants' App. p. 717, and "discussed what could have been done better" with regard to communication. Appellants' App. p 674. Assistant Principal Hensley was in attendance. Also "brought up" at the meeting was the fact that RHS operated a video surveillance system

6

that covered the area in the cafeteria where Megan choked. The surveillance footage is digitally preserved on a hard-drive for approximately ninety days.

Shortly after Megan choked, RCSC reported the incident to Indiana Insurance. On February 25, 2010, Indiana Insurance conducted an investigation of the incident "oriented toward the prospect of litigation." Appellants' App. p. 928. This included on-site interviews with certain RHS personnel. The investigation did not reveal to Indiana Insurance the existence of RHS's video surveillance system or its temporarily preserved footage. The video expired without ever having been seen by Indiana Insurance, RCSC, or the Lyonses.

A day or two after Megan's choking incident, Principal Bergdoll and Assistant Principal Hensley visited the Lyonses at Riley Chidren's Hospital. During the visit, Mrs. Lyons repeatedly asked Hensley how long Megan had been without oxygen. Hensely assured the Lyonses that it had been a "very short period of time," but "no one could ever tell [the Lyonses] what that meant." Appellants' App. p. 19. Similarly, the only information Principal Bergdoll relayed to the Lyonses during the visit was that Megan had choked. Bergdoll later admitted, "[T]hat's the best that we could come up with because I don't think anybody really knew, still don't know to my knowledge." Appellant's App. p. 649.

"Two or three times" after Megan's death, Mrs. Lyons requested to meet with Assistant Principal Hensley to discuss Megan's choking incident. Appellants' App. p. 820. Hensley's response each time was, "We'll get together." Appellants' App. p. 787. At least one of these requests was made prior to RHS's graduation ceremony on June 14, 2009. On this occasion, Hensley asked that the Lyonses contact him after graduation. The Lyonses did

7

not follow-up with Hensley.

On October 1, 2009, Swearingen called Mr. Lyons and informed him generally that "things were not done properly" with regard to RCSC's response to Megan's choking incident. Appellants' App. p. 788. Neither party to this five-minute conversation recalls specifically what was said, only that "the general conversation [had] to do with a time and response situation." Appellants' App. p. 315.

On January 11, 2010, the Lyonses filed a notice of tort claim with RCSC. The Lyonses filed their complaint for damages on June 8, 2010, alleging negligence, wrongful death, and civil rights violations. On May 6, 2011, the Lyonses sought third-party discovery from Indiana Insurance. Indiana Insurance moved to quash the request on May 18, 2011. On July 22, 2011, RCSC moved for summary judgment on all claims.

On September 20, 2012, the trial court granted Indiana Insurance's motion to quash, holding that Indiana Insurance owed no duty to the Lyonses to direct RCSC to preserve a copy of the video surveillance. On October 6, 2011, the Lyonses cross-moved for summary judgment on the issue of compliance with the ITCA's notice provision. On October 25, 2011, the Lyonses moved for leave to amend their complaint to add Indiana Insurance as defendant based on its failure to conduct a reasonable claims investigation.

On December 19, 2011, the trial court held a hearing on all pending motions. On March 22, 2012, the trial court issued an order denying the Lyonses' motion for summary judgment and granting summary judgment in favor of RCSC. On the same day, the trial court also denied the Lyonses' motion for leave to add Indiana Insurance as a defendant.

8

**DISCUSSION AND DECISION**

"In reviewing a motion for summary judgment, this court applies the same standard as the trial court." *Daugherty v. Dearborn Cnty.*, 827 N.E.2d 34, 35 (Ind. Ct. App. 2005). "We must determine whether there is a genuine issue of material fact, and whether the law has been correctly applied…." *Id.* "Neither the trial court, nor the reviewing court, may look beyond the evidence specifically designated to the trial court." *Id.* "A trial court's grant of summary judgment is clothed with the presumption of validity, and the appellant bears the burden of demonstrating that the trial court erred." *Id.*

## I. Indiana Tort Claims Act

The Lyonses argue that the trial court erred in granting RCSC summary judgment on the issue of compliance with the notice provision of the Indiana Tort Claims Act. The ITCA bars a claim against a political subdivision unless notice of the claim is given to the governing body within 180 days "after the loss occurs." Ind. Code § 34-13-3-8(a). It is undisputed that the Lyonses did not notify RCSC of its claims within 180 days of Megan's death. Rather, the Lyonses assert three alternative theories of compliance with the ITCA's notice provision: the discovery rule, fraudulent concealment, and substantial compliance.

### A. Discovery Rule

The Lyonses claim that their notice-of-claim was not untimely by virtue of the discovery rule. As stated above, the ITCA requires notice within 180 days "after the loss occurs." Ind. Code § 34-13-3-8(a). Under Indiana's discovery rule, a loss is said to occur "when the plaintiff knew or, in the exercise of ordinary diligence, could have discovered that

9

an injury had been sustained as a result of the tortious act of another.'" *Reed v. City of Evansville*, 956 N.E.2d 684, 691 (Ind. Ct. App. 2011), *trans. denied* (quoting *Wehling v. Citizens Nat'l Bank*, 586 N.E.2d 840, 843 (Ind. 1992)).

The discovery rule "has both an injury and a causation prong." *Evenson v. Osmose Wood Preserving Co. of Am., Inc.*, 899 F.2d 701, 703 (7th Cir. 1990) (applying Indiana law). Here, it is not disputed that the Lyonses knew of Megan's death well before the expiration of the ITCA's 180-day limitation period. We focus, therefore, on the causation prong of the discovery rule. In that regard, the Indiana Supreme Court has clarified that

> a claim subject to the discovery rule accrues when a plaintiff is informed of a "reasonable possibility, if not a probability" that an injury was sustained as a result of the tortious act of another, and that a person's "mere suspicion or speculation" as to causation of an injury is insufficient to trigger accrual.

*Reed*, 956 N.E.2d at 691 (quoting *Degussa Corp. v. Mullens*, 744 N.E.2d 407, 411 (Ind. 2001)). The question of when a plaintiff discovered facts which, in the exercise of ordinary diligence, should lead to the discovery of a reasonable possibility of causation is often a question of fact. *Degussa*, 744 N.E.2d at 410-11.

The Lyonses contend that they did not learn of a reasonable possibility that a causal link existed between RCSC's response to Megan's choking incident and the oxygen deprivation from which Megan ultimately died until October 1, 2009, when Swearingen informed Mr. Lyons that "things were not done properly," Appellants' App. p. 788, particularly with regard to RCSC's "time and response." Appellants' App. p. 315. RCSC counters that, through ordinary diligence, the Lyonses should have known of this possibility on January 10, 2009, when they learned that Megan had died from oxygen deprivation as a

10

result of her choking while in the care of RHS.

"[T]he exercise of [ordinary] diligence means simply that an injured party must act with some promptness where the *acts* and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 689 (Ind. Ct. App. 2006) (emphasis added). The constructive knowledge that RCSC seeks to impose on the Lyonses as of January 10, 2009, does not rise to this level. Such a conclusion relies on "mere suspicion or speculation" that RCSC *somehow* caused or exacerbated Megan's oxygen deprivation. *Degussa Corp.*, 744 N.E.2d at 411.

We conclude that the Lyonses must have possessed at least a basic knowledge of how RCSC acted in response to Megan's choking incident in order for there to be a reasonable possibility of a causal link between that response and Megan's death. As it favors the Lyonses, the evidence shows that the extent of Megan's oxygen deprivation is directly related to RCSC's response to it. But at the time of Megan's death, the Lyonses did not know how long Megan was without oxygen or any details of how RCSC responded to the emergency. Moreover, when the Lyonses requested this information, Assistant Principal Hensley assured them that Megan had been without oxygen for a "very short period of time" and put off meeting with them to discuss Megan's choking incident.

The proper question, therefore, is: in the exercise of ordinary diligence, could the Lyonses have learned of RCSC's alleged acts or omissions before July 15, 2009, which was 180 days before the Lyonses filed notice of their claims on January 11, 2010? This question

11

is not resolved by the designated evidence, and therefore, it remains a genuine issue of material fact for the jury's determination. Summary judgment on the Lyonses' ITCA claims was inappropriate.

## B. Fraudulent Concealment

The Lyonses claim that their notice-of-claim was not untimely because the ITCA's 180-day period was tolled by virtue of RCSC's fraudulent concealment. "Fraudulent concealment is an equitable doctrine that operates to estop a defendant from asserting the statute of limitations as a bar to a claim whenever the defendant, by his own actions, prevents the plaintiff from obtaining the knowledge necessary to pursue a claim." *Johnson v. Hoosier Enters. III, Inc.*, 815 N.E.2d 542, 549 (Ind. Ct. App. 2004) (quoting *Doe v. Shults–Lewis Child & Family Servs.*, 718 N.E.2d 738, 744 (Ind. 1999)). The doctrine tolls the statute of limitations when the defendant "has either by deception or by a violation of duty, concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action." *Doe*, 718 N.E.2d at 744-45 (quoting *Fager v. Hundt*, 610 N.E.2d 246, 251 (Ind. 1993)). "While the fraudulent concealment exception is an equitable doctrine, the relevant facts may be determined by a jury in the event of trial." *Fager*, 610 N.E.2d at 253.

### 1. Active Concealment

The Lyonses claim that RCSC actively concealed its tortious conduct from the Lyonses through the acts of LaRue and Assistant Principal Hensley. The Lyonses, however, designate no evidence from which a finder of fact might reasonably infer that either of these employees intended to conceal material facts from the Lyonses. "[A]ffirmative acts of

12

concealment must be calculated to mislead and hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation." *Ludwig v. Ford Motor Co.*, 510 N.E.2d 691, 697 (Ind. Ct. App. 1987). "There must be some trick or contrivance intended by the defrauder to exclude suspicion and prevent inquiry." *Id.*

The Lyonses contend that LaRue concealed material facts when, during a meeting with the school's cafeteria workers immediately after Megan's choking incident, LaRue threatened to fire the workers, including Swearingen, if they discussed the incident outside of RHS. Allegedly, this threat prevented Swearingen from disclosing RCSC's tortious conduct until nearly one year later, when she contacted Mr. Lyons. The undisputed evidence, however, shows that the purpose of LaRue's meeting was to discuss HIPAA privacy laws and RCSC confidentiality policies. Twice that school year, LaRue had conducted similar meetings, and Swearingen admitted that LaRue had informed her of these policies before. Further, the record reveals that LaRue had no personal knowledge of what happened in the cafeteria that day and that she was unaware that Swearingen had witnessed the incident. In fact, Swearingen testified that she never told anyone at RCSC what she had seen.

Moreover, the Lyonses make no showing that they relied on LaRue's statements in failing to discover a cause of action. Active fraudulent concealment requires a plaintiff to have "reasonably relied" on the defendant's deception in its hindrance of the plaintiff's discovery of a cause of action. *Nelson v. Sandoz Pharm. Corp.*, 288 F.3d 954, 968 (7th Cir. 2002) (citing *Doe v. United Methodist Church,* 673 N.E.2d 839, 845 (Ind. Ct. App. 1996)); *see Garneau v. Bush*, 838 N.E.2d 1134, 1143 (Ind. Ct. App. 2005). And "[m]ere silence on

the part of a defrauder will not constitute concealment absent a duty to speak." *Ludwig*, 510 N.E.2d at 697. Here, there is no evidence that the Lyonses had knowledge of LaRue's meeting with the cafeteria workers or that she threatened to fire the workers if they spoke about Megan's choking incident outside of RHS. The Lyonses also never inquired to LaRue, Swearingen, or any other cafeteria worker for details about Megan's death. Active fraudulent concealment, therefore, cannot be found.

The Lyonses contend that Assistant Principal Hensley concealed material facts when, at the hospital following Megan's choking incident, he assured the Lyonses that Megan had been without oxygen for only "a short period of time." Appellants' App. p. 817. The Lyonses allege that Hensley knew this not to be true because he had attended a meeting on the afternoon of Megan's choking incident, at which school administrators "did a recap of what happened in the cafeteria" that day, Appellants' App. p. 717, and "discussed what could have been done better." Appellants' App. p. 674. From this, the Lyonses infer that Hensley knew Megan had been without oxygen for more than a "short period," yet made this statement to the Lyonses to deliberately mislead them into believing she had not. We conclude that a jury could not reasonably make this inferential leap.

The subjectivity in and vagueness of Hensley's "very short period of time" statement make it nearly impossible to find fraudulent intent. Short of an admission by Hensley that he actually considered Megan to have been without oxygen for "a *long* period of time," a jury could only infer that Hensley *should have known* that his statement was misleading. Such a finding might support negligence, but it would not establish the intentional misconduct

14

required by active fraudulent concealment. *See Hughes v. Glaese*, 659 N.E.2d 516, 521-22 (Ind. 1995) (finding doctor's affirmation to patient that chest X-rays showed everything to be "okay" insufficient to support active fraudulent concealment without a showing that doctor had actual knowledge that X-ray findings showed signs of disease).

## 2. Passive Concealment

The Lyonses also assert claims that RCSC passively concealed key facts by failing to affirmatively disclose details of Megan's choking incident to the Lyonses. "[W]here a fiduciary or confidential relationship exists … there exists a duty to disclose material information between the parties and a failure to do so results in concealment." *Id.* at 520. The Lyonses' claims are creatively based on the special school-parent relationships created by the *in loco parentis* doctrine, the Federal Education & Privacy Rights Act, and public policy. None of these theories, however, has been held to establish a school's obligation to affirmatively disclose student information to parents. Finding that the Lyonses' assertion requires a substantial expansion of the law, we decline to recognize such a duty at this time.[1]

## C. Substantial Compliance

Assuming the Lyonses' cause of action accrued on the day Megan died, the Lyonses claim that substantial compliance excuses their untimely notice-of-claim. It is well settled that notice is sufficient if it substantially complies with the content requirements of the ITCA. *Boushehry v. City of Indpls.*, 931 N.E.2d 892, 895 (Ind. Ct. App. 2010) (citing *Collier v. Prater*, 544 N.E.2d 497, 499 (Ind. 1989)). The ITCA requires that notice "describe in a short

---

[1] While we find active and passive concealment cannot exist under these facts, the actions or inactions

and plain statement the facts on which the claim is based" and "include the circumstances which brought about the loss, the extent of the loss, the time and place the loss occurred, the names of all persons involved if known, the amount of the damages sought, and the residence of the person making the claim…." Ind. Code § 34-13-3-10. The purpose of these requirements is "to inform a political subdivision with reasonable certainty of the accident and surrounding circumstances so that the political subdivision may investigate, determine liability and prepare a defense to the claim." *Daugherty*, 827 N.E.2d at 36. Substantial compliance with the notice requirements of the ITCA is a question of law. *Rudnick v. N. Ind. Commuter Transp. Dist.*, 892 N.E.2d 204, 207 (Ind. Ct. App. 2008).

The Lyonses contend they substantially complied with the ITCA notice provision because RCSC had full knowledge of the facts and circumstances surrounding Megan's death and promptly reported the incident to its insurer, who conducted an investigation of the incident "oriented toward the prospect of litigation." Appellants' App. p. 928. Our courts, however, have consistently held that actual knowledge of a claimant's injury, even when coupled with an investigation of the incident, "will not suffice to prove substantial compliance." *Collier*, 544 N.E.2d at 499 (citing *Geyer v. Logansport*, 370 N.E.2 333, 336 (Ind. 1977)); *accord Brown v. Alexander*, 876 N.E.2d 376, 383 (Ind. Ct. App. 2007); *Fowler v. Brewer*, 773 N.E.2d 858, 865 (Ind. Ct. App. 2002). The municipality must be "advise[d] of the injured party's intent to assert a tort claim." *Bienz v. Bloom*, 674 N.E.2d 998, 1005 (Ind. Ct. App. 1996) (citing *Collier*, 544 N.E.2d at 499); *accord McConnell v. Porter*

---

of RCSC, as argued by the Lyonses, remain relevant for a factfinder's determination of the discovery rule.

*Memorial Hosp.* 698 N.E.2d 865, 868 (Ind. Ct. App. 1998). "[T]he statutory purpose of providing opportunity to investigate is not fully realized except when notice is had in the context that one is claiming municipal liability for injury." *Batchelder v. Haxby*, 337 N.E.2d 887, 890 (Ind. Ct. App. 1975); *accord Collier*, 544 N.E.2d at 499 ("Because the city was not apprised of the claimant's intention to bring suit, any investigation it conducted was inadequate since it was undertaken without an eye firmly cast toward potential liability and litigation."). As such, substantial compliance cannot exist "when the claimant took no steps whatsoever to comply with the notice statute." *Brown*, 876 N.E.2d at 383. Because the Lyonses filed no notice-of-claim—defective or otherwise—within 180 days of Megan's death, their reliance on substantial compliance is without merit.[2]

## II. Contributory Negligence

The Lyonses argue that the trial court erred in granting RCSC summary judgment on the issue of contributory negligence. "As a defense to a negligence claim, contributory negligence is generally a question of fact. It can be a question of law if the court can say that no reasonable person would have acted as the plaintiff did under the circumstances." *N. Ind. Pub. Serv. Co. v. E. Chicago Sanitary Dist.*, 590 N.E.2d 1067, 1075 (Ind. Ct. App. 1992). Below RCSC asserted that, if it were liable for failing to cut Megan's sandwich into pieces on the day that Megan choked, the Lyonses were contributorily at fault for not informing RHS or its paraprofessionals that Megan's sandwich needed to be cut. (Appellee's Br. 43).

_____

[2] We note, without speculating on the reason or the outcome, that our supreme court has recently granted transfer in the case of *Schoettmer v. Wright*, 971 N.E.2d 118 (Ind. Ct. App. 2012), in which we held that a plaintiff's settlement discussions with a government entity's insurer were not sufficient to constitute

17

Contributory negligence as a matter of law is only appropriate where the plaintiff's negligence is so "clear and palpable that no verdict could make it otherwise." *Id.* (quoting *Meadowlark Farms v. Warken*, 176 Ind. App. 437, 446, 376 N.E.2d 122, 131–32 (1978)). Finding that this strict standard has not been met, we conclude that the trial court erred in granting summary judgment on this issue.

### III.  Section 1983 Claims

The Lyonses argue that the trial court erred in granting RCSC summary judgment on the issue of RCSC's liability under 42 U.S.C. § 1983.[3]  This Code section establishes liability against persons who, under color of state law, deprive others of their constitutional rights.  42 U.S.C. § 1983.  In order to succeed on a § 1983 claim, the Lyonses must show that (1) RCSC deprived Megan or the Lyonses of a right secured by the Constitution and laws of the United States, and (2) that it acted under color of state law.  *Windle v. City of Marion, Ind.*, 321 F.3d 658, 661 (7th Cir. 2003).  The latter requirement is not at issue in this case.

The Lyonses claim that RCSC owed Megan a constitutional duty of protection and that certain school administrators deprived Megan of her Fourteenth Amendment right to life by responding to Megan's emergency with deliberate indifference.  The Lyonses also argue that RCSC is municipally liable because it maintained express and implied unconstitutional policies that caused Megan's death.  In addition, the Lyonses argue that RCSC violated their due process right of access to the courts by acting to cover up its tortious conduct.

---

substantial compliance with the ITCA when the plaintiff did not also communicate—in writing or otherwise—his intended claim to the government entity.

[3] Failure to comply with ITCA's notice provision is not a bar to asserting claims under § 1983.

## A. Failure to Protect

The Lyonses claim that RCSC owed Megan a constitutional duty of protection. Due process "generally does not impose upon the state a duty to protect individuals from harm by private actors." *King ex rel. King v. E. St. Louis Sch. Dist. 189*, 496 F.3d 812, 817 (7th Cir. 2007) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195-96 (1989)). There are, however, two exceptions to this general rule. "[T]he Constitution imposes a duty upon the state to protect individuals with whom it has a 'special relationship' by virtue of the state's custody over the individual." *Id.* (citing *DeShaney*, 489 U.S. at 199-200). And "the substantive component of the Due Process Clause imposes upon the state a duty to protect individuals against dangers the state itself creates…." *Id.* (citing *Monfils v. Taylor*, 165 F.3d 511, 516 (7th Cir. 1998)).

### 1. Special Relationship

The Lyonses claim that Megan's disabilities and RCSC's implementation of a plan to accommodate them created a special relationship between RCSC and Megan, giving rise to a constitutional duty on the part of RCSC to protect Megan from the consequences of her disabilities while at school. An affirmative duty to protect an individual arises "where the state has exercised its power so as to render [that] individual unable to care for himself or herself." *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272 (7th Cir. 1990) (citing *DeShaney*, 489 U.S. at 200). "But beyond the case of incarcerated prisoners and involuntarily committed mental patients, the Supreme Court has never recognized such a

---

*Werblo v. Bd. of Trustees of Hamilton Heights Sch. Corp.*, 537 N.E.2d 499, 501-02 (Ind. 1989).

duty."[4]  *Id.*  Moreover, "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." *Deshaney*, 489 U.S. at 200.  "Inaction by the state in the face of a known danger is not enough to trigger the obligation…." *Reed v. Gardner*, 986 F.2d 1122, 1125 (7th Cir. 1993) (discussing *Deshaney*, 489 U.S. at 200).  Megan's disabilities were not imposed on her by RCSC; therefore, no special relationship existed.

## 2. State-Created Danger

The Lyonses claim that RCSC had a constitutional duty to protect Megan because it created the danger that caused her death.  Specifically, the Lyonses contend that RCSC endangered Megan by: (1) negligently hiring DeLucio; (2) failing to train its paraprofessionals in the Heimlich maneuver, CPR, or basic first aid; (3) failing to adequately supervise Megan while eating; (4) failing to adequately respond to Megan's emergency; (5) failing to provide nurses with critical information; and (6) failing to promptly call 911.

The state-created danger doctrine requires that danger result from some affirmative act of the state that shocks the conscience.  *King ex rel. King*, 496 F.3d at 817-18.  By logical definition, however, inaction is not an affirmative position.  *Windle*, 321 F.3d at 662 n.2.

---

[4] Although not argued by the Lyonses, school children have been commonly analogized to prisoners and mental patients under the special relationship doctrine because school attendance is compulsory and because, to some extent, school authorities act *in loco parentis*.  But "[t]he circuits that have confronted this issue have uniformly rejected this argument, holding that school children are not captives of the school authorities and the basic responsibility for their care remains with their parents." *Hasenfus v. LaJeunesse*, 175 F.3d 68, 71 (1st Cir. 1999) (citing *J.O. v. Alton Cmty. Unit Sch. Dist. 11*, 909 F.2d 267, 272-73 (7th Cir. 1990) (additional citations omitted)).

> The term "affirmative act" suggests a willful deviation from the *status quo.* Thus an affirmative act will have as a counterpoint a non-affirmative position. Typically, this involves inaction. Here Appellant posits a situation where not acting was an affirmative act and therefore the [Appellee was] faced with the choice between affirmatively choosing to do nothing and affirmatively doing something. Under this scenario there is no non-affirmative position for the Appellee to have taken. This is simply illogical.

*Id.* Therefore, the Lyonses' asserted failure-based acts cannot constitute state-created dangers. The Lyonses' remaining allegation, negligent hiring, fails because it is not conscience shocking. To shock the conscience, "conduct must be more culpable than mere negligence, which is 'categorically beneath the threshold of constitutional due process.'" *King ex rel. King*, 496 F.3d at 818 (quoting *Sacramento v. Lewis*, 523 U.S. 833, 849 (1998)).

## B. Municipal Liability

The Lyonses claim municipal liability against RCSC by challenging the constitutionality of both its express policy not to tell nurses detailed emergency information over the radio and its customs of failing to train its paraprofessionals in the Heimlich maneuver, CRP, and basic first aid, and of failing to implement a school choking policy. *See City of Canton, Ohio v. Harris*, 489 U.S.378 (1989). But a plaintiff must prove that individual state actors are liable on an underlying substantive claim in order to recover damages from a municipality for its unconstitutional policies or customs. *See City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *see also Windle*, 321 F.3d at 663. Since the Lyonses failed to assert a viable claim against any RCSC administrator under the failure to protect theories discussed above, their claims of municipal liability also must fail.

## C. Judicial Access

In addition to their claims on behalf of Megan, Mr. and Mrs. Lyons each assert their own § 1983 claims, alleging that RCSC interfered with their due process right of access to the courts. "The right of individuals to pursue legal redress for claims which have a reasonable basis in law and fact is protected by the First and Fourteenth Amendments." *Love v. Bolinger*, 927 F. Supp. 1131, 1137 (S.D. Ind. 1996). "A corollary of this right is that efforts by state actors to impede an individual's access to courts ... may provide the basis for a constitutional claim under 42 U.S.C. § 1983." *Id.* An accidental, inadvertent, or otherwise unintentional deprivation of access does not rise to the level of a due process violation under § 1983. *Guffey v. Trago*, 572 F. Supp. 782, 786 (N.D. Ind. 1983); *see Marsh v. Kirschner*, 31 F. Supp. 2d 79, 81 (D. Conn. 1998) (dismissing plaintiff's § 1983 claim for failure to allege that defendant intentionally interfered with plaintiff's right of access) (citing *Barrett v. U.S.*, 689 F.2d 324, 331-32 (2d Cir.1982)).

The Lyonses contend RCSC interfered with their right to judicial access by: (1) LaRue threatening to fire Swearingen; (2) Hensley assuring the Lyonses that Megan had been without oxygen for only "a very short period of time"; (3) Hensley failing to meet with the Lyonses; (4) RCSC failing to preserve RHS's video surveillance footage; (5) RCSC failing to conduct a formal investigation as required by RHS's Emergency Preparedness Plan; and (6) RCSC failing to report DeLucio's neglect of Megan as required by Indiana law. The Lyonses, however, have failed to designate evidence from which a finder of fact might reasonably infer that any of these acts were intended by RCSC to cover up its alleged tortious conduct.

## IV. Indiana Insurance

The Lyonses argue that the trial court abused its discretion in granting Indiana Insurance's motion to quash the Lyonses' third-party discovery requests and in denying the Lyonses' motion for leave to amend their complaint to add Indiana Insurance as a defendant. "An abuse of discretion may occur if the trial court's decision is clearly against the logic and effect of the facts and circumstances before the court or if the trial court has misinterpreted the law." *In re Ind. Newspapers Inc.*, 963 N.E.2d 534, 543 (Ind. Ct. App. 2012).

The Lyonses requested that Indiana Insurance provide deposition and documents concerning its claims investigation and evidence preservation policies, generally; and the investigation of Megan's death and the preservation (or lack thereof) of the video surveillance, specifically. The asserted purpose of this discovery was to investigate and develop a third-party spoliation claim against Indiana Insurance for its failure to preserve RHS's video surveillance footage. In addition to the privileged nature of many of the requested documents, the trial court found that Indiana Insurance did not owe a duty to the Lyonses to direct RCSC to preserve a copy of the video. Further, the trial court "[did] not believe that the doors to the insurance company and its files should be opened under the guise of conducting discovery for a possible third-party spoliation claim." Appellants' App. p. 23. We agree.

The Lyonses claim that Indiana Insurance owed them a duty to direct RCSC to preserve RHS's video surveillance footage because litigation was foreseeable. In determining whether an insurer owes a duty to a plaintiff to maintain evidence "we analyze

(1) the relationship between the parties, (2) the reasonable foreseeability of the type of harm to the type of plaintiff at issue, and (3) the public policy promoted by recognizing an enforceable duty." *Am. Nat. Prop. & Cas. Co. v. Wilmoth*, 893 N.E.2d 1068, 1070-71 (Ind. Ct. App. 2008). In *Wilmoth*, "we concluded that the third-party insurer had no duty to the claimant to preserve evidence 'when no lawsuit had been filed, when the relevance of the evidence could not have been anticipated, and when [the insurer] never had possession of the evidence.'" *Kelley v. Patel*, 953 N.E.2d 505, 510 (Ind. Ct. App. 2011) (quoting *Wilmoth*, 893 N.E.2d at 1074).

Here, although Indiana Insurance conducted an investigation into Megan's choking incident "oriented toward the prospect of litigation," Appellants' App. p. 928, it is undisputed that Indiana Insurance did not take possession of RHS's video surveillance footage. While the lack of physical possession is not dispositive of the issue, *Kelley*, 953 N.E.2d at 510 (citing *Wilmoth*, 893 N.E.2d at 1072), "it lessens the relationship between the insurer and the [third-party claimant]" and "counsels against" finding that Indiana Insurance owed a duty to the Lyonses. *Id.* (citing *Thompson ex rel. Thompson v. Owensby*, 704 N.E.2d 134, 137 (Ind. Ct. App. 1998)). Even more so, the record indicates that Indiana Insurance had no knowledge that the surveillance system or the video footage existed until well after the ninety-day storage period had expired. It is hard to imagine how an insurer could have owed a third-party claimant a duty to preserve evidence when neither party was aware of the evidence's existence at the time of spoliation.

The Lyonses further contend that Indiana Insurance owed them a duty to reasonably

investigate Megan's choking incident, by which it should have discovered the surveillance system and video footage during its on-site investigation of RHS. The Lyonses, however, rely on a misreading of the following passage from *Thompson*:

> A liability carrier has a duty in the ordinary course of business to investigate and evaluate claims made by its insureds. *Burr v. United Farm Bureau Mut. Ins. Co.*, 560 N.E.2d 1250, 1255 (Ind. Ct. App. 1990), *trans. denied.* In carrying out this duty, carriers take possession of documents and things that must be authenticated and tested to evaluate claims. These same documents and things will be key items of evidence in the event that the claims are denied and litigation ensues. This conduct by necessity gives rise to a relationship with the third party claimant.

704 N.E.2d at 137.

Contrary to the Lyonses' assertion, an insurer's duty to investigate arises from its contract with the insured, not any special relationship with a third-party claimant. *See Goodyear Tire & Rubber Co. v. Chiles Power Supply, Inc.*, 190 F.R.D. 532, 535 (S.D. Ind. 1999) (stating that an insurer's duty to investigate is contractual). In *Thompson*, we considered that, because a liability insurer owes its insured a duty to investigate, it should foresee that certain evidence it encounters during its investigation of a claim will be relevant in future litigation surrounding that claim. 704 N.E.2d at 137 ("Liability insurance carriers are no strangers to litigation, and it strains credulity to posit … that a liability carrier could be unaware of the potential importance of physical evidence."). This foreseeability[5] supports a finding that the insurer stands in a special relationship with a third-party claimant that may give rise to a duty to preserve that evidence. But, Indiana Insurance did not owe the Lyonses

---

[5] We note that not all evidence is foreseeably relevant. *See Am. Nat. Prop. & Cas. Co. v. Wilmoth*, 893 N.E.2d 1068, 1072 (Ind. Ct. App. 2008) (distinguishing *Thompson*).

a duty to investigate.

The trial court did not abuse its discretion quashing the Lyonses third-party discovery requests. And because we hold that the Lyonses cannot assert a valid spoliation claim against Indiana Insurance, the trial court's denial of the Lyonses' motion for leave to amend the complaint to add Indiana Insurance as a defendant also was not in error.

The judgment of the trial court is affirmed in part and reversed in part.

BAKER, J., concurs.

ROBB, C.J., concurs in part, concurs in result in part, and dissents with opinion.

26

# IN THE
# COURT OF APPEALS OF INDIANA

MICHAEL E. LYONS, Individually; )
DENITA L. LYONS, Individually; )
MICHAEL E. LYONS and DENITA L. )
LYONS, as Co-personal Representatives )
of the Estate of Megan Renee Lyons, deceased, )
              )
        Appellants/Plaintiffs, )
              )
     vs. )     No. 89A04-1204-PL-159
              )
RICHMOND COMMUNITY SCHOOL )
CORPORATION d/b/a RICHMOND HIGH )
SCHOOL; JOE SPICER; JEFFREY THORNE; )
and MAGGIE LaRUE, in their individual )
and official capacities, )
              )
        Appellees/Defendents. )

**ROBB, Chief Judge, concurring in part, concurring in result in part and dissenting in part with opinion.**

I concur with the majority's decision that the trial court improperly granted summary judgment on the Lyonses' ITCA claims because a genuine issue of material fact remains as to when the Lyonses could have learned of RCSC's alleged acts or omissions and whether that was within 180 days of filing their notice of claim. I, however, would also hold that the Lyonses have made a case for tolling the time period in which they could file their notice of claim because of fraudulent concealment. I also respectfully dissent from the majority's

decision that that trial court properly granted summary judgment to RCSC on the Lyonses' Section 1983 claims. As to all other aspects of the majority opinion, I concur.

I believe many of the things that raise a question of fact as to when the Lyonses should have discovered their cause of action also raise a question of fact as to whether RCSC was fraudulently concealing material facts concerning the Lyonses' cause of action. RCSC Principal Bergdoll was present at two meetings on the day of the incident. In one meeting, Bergdoll and LaRue met with cafeteria employees and told them not to discuss the incident with anyone. Allegedly, this was a reminder about HIPAA regulations and RCSC confidentiality policies. However, assuming RCSC was a covered entity required to comply with the HIPAA Privacy Rule,[6] HIPAA would not preclude any disclosures to Megan's parents about the incident. See 45 C.F.R. § 164.502(g) (concerning implementation of the Rule with respect to unemancipated minors). There is no indication this distinction was made clear to employees at the meeting. Moreover, a cafeteria worker's eyewitness account of the incident would not be protected health information subject to the Privacy Rule. RCSC's confidentiality policy is not part of the record, but I believe it is unlikely it would preclude disclosures to parents in situations such as this. LaRue told the cafeteria employees the sanction for speaking about the incident would be immediate termination of employment. Neither Bergdoll nor LaRue asked the workers if they had seen anything. In the second, Bergdoll held a meeting with school administrators, including vice principal Hensley, to

_____

[6] HIPAA applies to "covered entities," defined as a health plan, a health care clearinghouse, or a health care provider who transmits health information in electronic form in connection with covered transactions. 45 C.F.R. § 160.103. Most schools, even those that may have health information, are not

28

recap what had happened and discuss what could have been done differently. The existence of the cafeteria video surveillance tape was also discussed at that meeting. Despite the acknowledgement of the video during this meeting, it was never viewed and it was not preserved. Bergdoll stated during a deposition that she had not watched the video because she saw no reason to.

While Megan was still in the hospital, Hensley told the Lyonses that she had been without oxygen for a very short period of time. Although that phrase is susceptible to more than one interpretation, "very short time" in this context would not likely be understood by anyone to be as long as fifteen to twenty minutes, the time Megan was actually without oxygen. Two or three times, the Lyonses asked to sit down with Hensley and go over what had happened. The last time, prior to RCSC graduation ceremonies on June 14, 2009, Hensley told them to contact him after graduation. One hundred and eighty days after Megan's choking incident was June 7, 2009.

There are two types of fraudulent concealment: active and passive. Garneau v. Bush, 838 N.E.2d 1134, 1142 (Ind. Ct. App. 2005), trans. denied. Active concealment occurs when there is an intention to mislead, to hinder a plaintiff from obtaining information by the use of ordinary diligence, or to prevent inquiry or elude investigation. Hopster v. Burgeson, 750 N.E.2d 841, 854 (Ind. Ct. App. 2001). Passive concealment can be merely negligent and arises from failure to disclose material information when a special relationship exists between the parties. Hughes v. Glaese, 659 N.E.2d 516, 519 (Ind. 1995). Although

required to follow HIPAA because they do not engage in covered transactions.

29

fraudulent concealment is an equitable doctrine, where it is an issue subsidiary to the statute of limitations defense which is in turn subsidiary to an action at law, factual questions relevant to the statute of limitations are generally for a jury to determine. Fager v. Hundt, 610 N.E.2d 246, 253 n.5 (Ind. 1993).

In my opinion, the Lyonses have presented enough evidence to at least raise a question of fact as to whether the doctrine of fraudulent concealment applies in this case, and, if so, whether the concealment was active or passive, when the statute of limitations began to run, and ultimately, whether they filed their notice within a reasonable time. The Lyonses designated evidence that Hensley was less than forthright with them in answering their question about how long Megan was without oxygen or agreeing to meet with them to discuss the incident; that not only did the school not preserve a video that would have shown the incident, but did not even bother to view it; and that employees who were in the vicinity were threatened with termination if they discussed the incident. The Lyonses relied on Hensley's assertion that Megan had been without oxygen for a "very short period of time" and believing there was no way to know exactly what happened in the cafeteria that day until Swearingen contacted them, did not suspect anything more egregious than that their child, who had known eating issues, had simply choked and died despite everyone doing everything they could to save her. LaRue did not speak directly to the Lyonses, but in speaking to her employees, including Swearingen, and possibly misrepresenting their obligations under the law, she might have kept her employees from speaking to the Lyonses, further keeping them unaware of the actual course of events. Mrs. Lyons testified during her deposition that she

30

and her husband "always said we had to believe, we had to believe that everything was done and should have been done, until we found out differently. And we had told ourselves if anything went wrong that day and things didn't happen the way we were told or the way things should have happened, it would come out." Appellants' App. at 300-01. Whether or not RCSC's actions and inactions, through its employees, constituted fraudulent concealment, is not an issue I believe the trial court should decide on summary judgment because it requires weighing the evidence to determine whether there was intent and reasonable reliance. Therefore, I would also reverse the trial court's grant of summary judgment on this ground.

I also respectfully dissent from the majority's decision affirming the trial court's grant of summary judgment on the Lyonses' Section 1983 claims. I believe there is at least a question of fact as to whether there was a special relationship between RCSC and Megan. Hasenfus v. LaJeunesse, 175 F.3d 68 (1st Cir. 1999), cited by the majority, see slip op. at 20 n.4, does note that circuits that have considered whether a student is similar to a prisoner or a patient with respect to whom a special duty of care exists have "uniformly rejected" the argument. Id. at 71. However, Hasenfus also quotes Vernonia Sch. Dist. v. Acton, 515 U.S. 646, 655 (1995), in which the Supreme Court stated, "[W]e do not, of course, suggest that public schools as a general matter have such a degree of control over children as to give rise to a constitutional 'duty to protect.'" (Emphasis added.) Hasenfus posits the Supreme Court's language does not foreclose "now and forever" liability for a due process violation for inaction by a school toward a pupil, but leaves open the possibility that "in narrow

31

circumstances there might be a 'specific' duty." 175 F.3d at 71-72. Those narrow circumstances are limited to "behavior so extreme as to 'shock the conscience' . . . [or] conduct that is truly outrageous, uncivilized, and intolerable." Id. at 72.

"In the context of educating children, the in loco parentis doctrine is particularly important based on Indiana's compulsory education laws mandating the availability of public education for its citizens and the ensuing recognition that schools need to stand in the position of parents and guardians to the students . . . ." Griffin v. Simpson, 948 N.E.2d 354, 358 (Ind. Ct. App. 2011); see also Vernonia Sch. Dist., 515 U.S. at 655 ("[W]e have acknowledged that for many purposes 'school authorities ac[t] in loco parentis[.]'"). Even more than with a typical high school student, RCSC was acting in loco parentis with respect to Megan, who, because of her disabilities, was labeled "severely and profoundly handicapped." Appellant's App. at 325. Although Megan was seventeen years old, she was non-verbal and functioned at the level of a two- or three-year old child. Megan was incapable of caring for herself and required supervision at all times. RCSC was not so much providing educational resources to Megan as assisting her with developmental goals. It was not just her guardian during the school day, but also her caretaker. The State of Indiana implemented Individual Education Programs for Megan that recognized her special needs, including in the area of food consumption, and RCSC assigned a one-on-one paraprofessional to Megan to attend to her needs. Mrs. Lyons testified that "[w]e knew she a had [sic] one-on-one para who was there and could have and should have responded to any immediate need. I always thought that was Ms. Vicki, and I had the comfort that it was Ms.

Vicki because of the relationship she had with Megan." Appellants' App. at 300. Lett had been Megan's paraprofessional for at least two years prior to this incident, but on the day Megan choked, a different paraprofessional was assisting her at lunch unbeknownst to her parents. Despite knowing that choking was a known danger of Megan's condition, the school had no apparent protocol in place for handling a situation such as this, either for Megan or any other student, and when Nurse Provance was called to the cafeteria, she was not alerted to the emergency nature of the call. Whether, under these circumstances, RCSC failed to protect Megan from a danger it created (by giving her a different paraprofessional on this day) or made worse (in its response to the emergency), and whether its conduct "shocks the conscience" is a fact issue I believe inappropriate for summary judgment. See King ex rel. King v. East St. Louis Sch. Dist. 189, 496 F.3d 812, 818 (7th Cir. 2007) ("The inquiry into whether official conduct shocks the conscience in a given case is a necessarily fact-bound inquiry."). I would therefore reverse the entry of summary judgment on the Lyonses' Section 1983 claim.