ATTORNEYS FOR APPELLANTS

Gary P. Price
David W. Gray
Matthew S. Tarkington
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES

Rick D. Meils
John W. Mervilde
Indianapolis, Indiana

James S. Stephenson
Rosemary L. Borek
Indianapolis, Indiana



FILED
Oct 28 2014, 1:11 pm

CLERK
of the supreme court,
court of appeals and
tax court

# In the
# Indiana Supreme Court

No. 89S04-1312-PL-788

MICHAEL E. LYONS, INDIVIDUALLY; DENITA
L. LYONS, INDIVIDUALLY; MICHAEL E.
LYONS AND DENITA L. LYONS, AS CO-
PERSONAL REPRESENTATIVES OF THE
ESTATE OF MEGAN RENEE LYONS,
DECEASED,

*Appellants (Plaintiffs below),*

v.

RICHMOND COMMUNITY SCHOOL
CORPORATION D/B/A RICHMOND HIGH
SCHOOL; JOE SPICER; JEFFREY THORNE; AND
MAGGIE LARUE, IN THEIR INDIVIDUAL AND
OFFICIAL CAPACITIES,

*Appellees (Defendants below),*

INDIANA INSURANCE COMPANY,

*Appellee (Non-Party Respondent).*

Appeal from the Wayne Superior Court, No. 89D01-1006-PL-11
The Honorable Peter D. Haviza, Special Judge

**October 28, 2014**

**Massa, Justice.**

The parents of a child who choked to death during lunchtime in a high school cafeteria sued the school and several administrators. The trial court granted defendants' motion for summary judgment. We reverse.

**Facts and Procedural History[1]**

Megan Lyons, a seventeen-year-old Richmond High School student with Down Syndrome, was severely disabled. She had difficulty eating and sometimes failed to chew her food sufficiently or took too many bites before swallowing. To address these concerns, Achieva Resources Corporation, a provider for persons with developmental disabilities, worked with the State to develop safety plans for Megan. Achieva Program Manager Julia Hamilton provided the School with Megan's Risk Plan, which stated in part: "Staff monitors Megan at every meal/snack. She is never to be left alone to eat a meal or snack." App. at 517. Hamilton also provided the School with Megan's Dining Plan, which stated in part:

> Megan does not chew her food well. Some foods she does not chew
> at all, she swallows whole. Megan tends to shovel her food. She
> will choke if she gets too much in her mouth. Megan needs

---

[1] The parties dispute some of the relevant facts, but as this case comes before us on summary judgment, we here recite the facts most favorable to the Lyonses' claims.

monitoring during meals/snacks.  She eats fast and needs verbal prompts to slow down.

App. at 562.  According to Megan's paraprofessional, Vicki Lett, "there was an established procedure because [the School] knew how Megan only chewed once or twice and just swallowed her food.  Her food was to be cut up."  App. at 933.

On January 7, 2009, however, paraprofessional Cindy DeLucio was assigned to supervise Megan during lunchtime.  DeLucio had never supervised Megan during lunch before, was unaware of her Risk and Dining Plans, and did not cut Megan's sandwich into pieces.  At some point during the lunch period, Megan began to choke, and DeLucio sought help from Assistant Principal Joe Spicer, who was in the hallway outside the cafeteria.  When she was unable to get his attention, DeLucio called Lett, who was stationed at a nearby table.  Lett began pounding Megan's back and told DeLucio to get help.  DeLucio returned with Assistant Principal Jeff Thorne, who also pounded Megan on the back.  These efforts were unsuccessful, so DeLucio approached Spicer and told him he was needed in the cafeteria.  Spicer went to Megan and began trying to assist Thorne.  During this time, no one attempted the Heimlich maneuver or CPR, and despite the fact that the School's Quick Response Guide recommends calling 911 immediately in the event of an emergency, no one did.  Toni Amburgey, a health teacher responsible for training students in CPR, was standing in the cafeteria doorway but did not offer any assistance.

Three or four minutes after Megan began choking, someone contacted the nurse's station.  Nurse Sharon Provance received the call and assumed there had been a fight, so before walking to the cafeteria, she gathered first-aid supplies and prepared a bag of ice.  She arrived about ten minutes after receiving the call, at which point she removed a tennis ball-sized clump of bread from Megan's mouth but was unable to clear her airway.  Provance then instructed Spicer to call 911, which he did.  Emergency medical technicians arrived approximately three minutes later and restored Megan's airway before taking her to the hospital.

Shortly afterward, Principal Barbara Bergdoll and Food Services Coordinator Margaret LaRue held a meeting with cafeteria worker Rhonda Swearingen, who had witnessed the entire

3

incident, and three other cafeteria workers. LaRue, while pointing at Swearingen, told the cafeteria workers that if they spoke to anyone about the incident, they would be fired on the spot. That same afternoon, Bergdoll also held a second meeting with various school administrators, including Assistant Principal Rusty Hensley, at which attendees "discussed what could have been done better" during the incident. App. at 674. Someone also brought up the fact that the School's video surveillance system covered the area of the cafeteria where Megan was sitting, and the cameras were angled such that they would have recorded the entire choking incident. Administrators can download video footage to their computers in 10 minutes, and they routinely review it anytime there is a fight or a theft. The footage is preserved for 90 days and then overwritten to conserve space on the hard drive.

The Richmond Community School Corporation reported the incident to its insurer, Indiana Insurance. On February 25, Indiana Insurance conducted an investigation "oriented toward the prospect of litigation," including on-site interviews with school personnel. App. at 928. Indiana Insurance, however, never discovered the existence of the surveillance system or the video footage. Ultimately, no one ever downloaded the video, and it was presumably overwritten. Bergdoll later testified no one watched it because "I don't think we thought there was a reason." App. at 636.

While Megan was in the hospital, Bergdoll and Hensley visited the Lyonses there. During the visit, Mrs. Lyons asked Hensley several times how long Megan had been without oxygen, and he responded "it was a very short period of time." App. at 817. Bergdoll said only that Megan had choked. Megan passed away on January 10.

After Megan's death, Mrs. Lyons repeatedly requested a meeting with Hensley to discuss what had happened. Each time, Hensley responded, "we'll get together," but no meeting was ever scheduled. App. at 311. At one point, Hensley suggested waiting to schedule a meeting until after graduation on June 14, 2009. The Lyonses did not follow up with him.

On October 1, 2009, Swearingen contacted Mr. Lyons and informed him that "things were not done properly" during the emergency. App. at 788. On January 11, 2010, the Lyonses filed a

4

Notice of Tort Claim; about six months later, they filed a complaint against RCSC, Spicer, Thorne, and LaRue, alleging negligence, wrongful death, and federal civil rights violations. During discovery, the Lyonses sought certain information from Indiana Insurance, which moved to quash their request. The trial court granted that motion, concluding (1) Indiana Insurance did not owe the Lyonses a duty to direct the School to preserve the video evidence and (2) most of the documents the Lyonses had requested were privileged.

The defendants moved for summary judgment on all claims, and the Lyonses filed a cross-motion for summary judgment on the issue of their compliance with the Indiana Tort Claims Act notice requirement. They also moved for leave to add Indiana Insurance as a defendant based upon its failure to conduct a reasonable investigation of the incident. After a hearing, the trial court issued a summary order granting the defendants' motion and denying the Lyonses' motions.

The Lyonses appealed, and in a published opinion, a divided panel of our Court of Appeals affirmed in part and reversed in part, concluding the defendants were entitled to summary judgment on the Lyonses' federal claims but not on the ITCA notice issue or on the state law claims. Lyons v. Richmond Cmty. Sch. Corp., 990 N.E.2d 470, 476 (Ind. Ct. App. 2013). The majority also affirmed the trial court's decision to quash the Lyonses' third-party discovery requests and to deny their motion for leave to amend their complaint to add Indiana Insurance as a defendant. Id. at 488.

Then-Chief Judge Robb wrote separately, believing the defendants were not entitled to summary judgment on the ITCA notice issue for two reasons: (1) as the majority concluded, because there was a question of fact as to whether the discovery rule might apply to toll the 180-day time limit, and (2) as Chief Judge Robb believed, there was also a question of fact as to whether "RCSC was fraudulently concealing material facts concerning the Lyonses' cause of action." Id. at 488 (Robb, C.J., concurring in part, concurring in result in part, and dissenting in part). She noted this issue was particularly suited for the trier of fact because "it requires weighing the evidence to determine whether there was intent and reasonable reliance." Id. at 490. Finally, she

would have reversed the trial court's grant of summary judgment as to the Lyonses' federal claims. Id.

The School successfully sought rehearing, but the panel affirmed its original opinion in all respects, granting the petition only to clarify that ITCA notice requirement compliance is a question of law for the court to decide before trial, although it may depend upon the resolution of disputed facts. Lyons v. Richmond Cmty. Sch. Corp., 996 N.E.2d 1280, 1280 (Ind. Ct. App. 2013).

We granted transfer, thereby vacating the opinions below. Lyons v. Richmond Cmty. Sch. Corp., 999 N.E.2d 416 (Ind. 2013) (table); Ind. Appellate Rule 58(A).

## Standard of Review

We review the trial court's ruling on a motion for summary judgment de novo, and we will affirm a grant of summary judgment "only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Miller v. Dobbs, 991 N.E.2d 562, 564 (Ind. 2013) (quoting Overton v. Grillo, 896 N.E.2d 499, 502 (Ind. 2008)); Ind. Trial Rule 56(C). A "genuine issue" is one upon which the parties proffer differing accounts of the truth, or as to which conflicting inferences may be drawn from the parties' consistent accounts; a "material fact" is one that affects the outcome of the case. Williams v. Tharp, 914 N.E.2d 756, 761 (Ind. 2009). Like the trial court, "we construe all evidence and resolve all doubts in favor of the non-moving party." Miller, 991 N.E.2d at 564.

## Material Issues of Fact Remain as to Whether the Lyonses Complied with the ITCA Notice Requirement.

The Lyonses assert the trial court erred by granting RCSC's motion for summary judgment on the issue of their compliance with the ITCA notice requirement. The ITCA bars tort claims against political subdivisions like RCSC unless the plaintiffs file a Notice of Tort Claim within

6

180 days "after the loss occurred." Ind. Code § 34-13-3-8(a) (2008). Here, Megan's death occurred on January 10, 2009, but the Lyonses filed their Notice of Tort Claim on January 11, 2010—long after the 180-day time period had ended. The Lyonses, however, argue their noncompliance should be excused under one of three alternative theories: substantial compliance, the discovery rule, or fraudulent concealment.

## A. Substantial Compliance

As to the first of these, substantial compliance, we agree with the Court of Appeals that "substantial compliance cannot exist 'when the claimant took no steps whatsoever to comply with the notice statute.'" Lyons, 990 N.E.2d at 483 (quoting Brown v. Alexander, 876 N.E.2d 376, 383 (Ind. Ct. App. 2007)). Thus, as both parties agree "the Lyonses filed no notice-of-claim—defective or otherwise—within 180 days of Megan's death," id., we summarily affirm that portion of the opinion below concluding the Lyonses did not substantially comply with the ITCA notice requirement. Ind. Appellate Rule 58(A)(2).

## B. The Discovery Rule

As to the discovery rule, we again find ourselves in agreement with the panel below. The issue of whether the Lyonses could, in the exercise of ordinary diligence, have learned of the defendants' possibly tortious actions prior to July 15, 2009—180 days before they filed their Notice of Tort Claim—is "not resolved by the designated evidence" and thus not ripe for summary judgment. Lyons, 990 N.E.2d at 480–81. Therefore, we summarily affirm that portion of the opinion below concluding material issues of fact remain as to whether the discovery rule should apply to excuse the Lyonses' noncompliance with the ITCA notice requirement. Ind. Appellate Rule 58(A)(2).

**C. Fraudulent Concealment**

Finally, the Lyonses argue the defendants should be estopped from asserting their ITCA notice defense because they fraudulently concealed the existence of the Lyonses' claims. "Fraudulent concealment is an equitable doctrine that operates to estop a defendant from asserting the statute of limitations as a bar to a claim whenever the defendant . . . 'has, either by deception or by a violation of duty, concealed from the plaintiff material facts thereby preventing the plaintiff from discovering a potential cause of action.'" Doe v. Shults-Lewis Child & Family Servs., Inc., 718 N.E.2d 738, 744–45 (Ind. 1999) (quoting Fager v. Hundt, 610 N.E.2d 246, 251 (Ind. 1993)). In such cases, equity will toll the commencement of the applicable time limitation until such time as the plaintiff discovers, or in the exercise of ordinary diligence should discover, the existence of the cause of action. Id. The plaintiff then has "a reasonable amount of time" after that date to file his complaint.[2] Alldredge v. Good Samaritan Home, Inc., 9 N.E.3d 1257, 1261 (Ind. 2014) (quoting Shults-Lewis Child & Family Servs., 718 N.E.2d at 745).

The genus fraudulent concealment comprises two species: active and passive. Hughes v. Glaese, 659 N.E.2d 516, 519 (Ind. 1995).

**1. Active Fraudulent Concealment**

Active fraudulent concealment requires a showing that the defendant (1) had actual knowledge of the alleged wrongful act and (2) intentionally concealed it from the plaintiff (3) by making some statement or taking some action "calculated to prevent inquiry or to mislead," id. at 522, (4) upon which the plaintiff reasonably relied. Doe v. United Methodist Church, 673 N.E.2d

---

[2] Of course, unlike the common-law fraudulent concealment doctrine, Indiana's Fraudulent Concealment Act provides the plaintiff has the full statutory period, not just "a reasonable amount of time" in which to file his complaint. Ind. Code § 34-23-1-1 (2012 & Supp. 2013). But as the Lyonses have made no argument regarding the Fraudulent Concealment Act, we limit our discussion here to the common-law doctrine.

839, 845 (Ind. Ct. App. 1996). The Lyonses presented evidence that: Hensley told them Megan was deprived of oxygen for "a very short period of time" when in fact it may have been as long as twenty minutes; school officials were aware there was a videotape record of the tragedy that would be destroyed if they took no action to preserve it; that videotape record was subsequently destroyed; and LaRue threatened to fire Swearingen if she discussed the incident with anyone outside the school. Based upon that record, a factfinder could reasonably find the defendants committed active fraudulent concealment. See Lyons, 990 N.E.2d at 489 (Robb, C.J., concurring in part, concurring in result, and dissenting in part) (concluding this issue was not yet ripe for summary judgment). Thus, the trial court erred by granting the defendants' motion for summary judgment on this issue.

### 2. Passive Fraudulent Concealment

Passive fraudulent concealment requires (1) a relationship between the parties such that the defendant has a duty to disclose the alleged wrongful act to the plaintiff and (2) a breach of that duty. Guy v. Schuldt, 236 Ind. 101, 109, 138 N.E.2d 891, 895 (1956). The existence of a legal duty "is a question of law for the court." Benton v. City of Oakland City, 721 N.E.2d 224, 232 (Ind. 1999). The Lyonses allege the defendants' duty to them arises from three sources: the common-law doctrine of *in loco parentis*, the Federal Family Educational Rights & Privacy Act, and a general public policy favoring disclosure of student information to parents.

As to the first of these, the Lyonses cite no statute or case law, and we find none, recognizing the doctrine of *in loco parentis* in Indiana (or indeed anywhere else) to confer a duty upon a school to disclose information to a student's parents. Similarly, the Lyonses cite no statute or case law, and we find none, deriving such a duty from FERPA. Finally, although we are sympathetic to the Lyonses' public policy arguments, we must decline their invitation to establish a completely new legal duty here. But we encourage our General Assembly, charged with making policy for our state, to consider this issue carefully. It may be that, in this age of near-universal and compulsory education, when our schools provide myriad counselling, physical therapy,

9

recreation, and special needs assistance for our children, they should be required to disclose vital information about a student to the persons most intimately concerned—the student's parents.

**The Lyonses' State Law Claims Are Not Ripe For Summary Judgment.**

The Lyonses also argue the trial court erred in granting summary judgment to the defendants on their state law claims for negligence and wrongful death. In their motion for summary judgment, the defendants did not attack those claims directly; rather, they asserted that even if the Lyonses could prove their claims, they still could not recover because they were contributorily negligent as a matter of law by failing to inform the School of Megan's special dining needs. We note that "summary judgment is generally inappropriate in negligence cases because issues of *contributory negligence*, causation, and reasonable care are more appropriately left for the trier of fact." Estate of Mintz v. Conn. Gen. Life Ins. Co., 905 N.E.2d 994, 999 (Ind. 2009) (emphasis added) (quoting Coffman v. PSI Energy, Inc., 815 N.E.2d 522, 527 (Ind. Ct. App. 2004)). And we agree that the defendants have not shown the Lyonses' alleged negligence was so "clear and palpable that no verdict could make it otherwise," Lyons, 990 N.E.2d at 484 (quoting N. Ind. Pub. Serv. Co. v. E. Chi. Sanitary Dist., 590 N.E.2d 1067, 1075 (Ind. Ct. App. 1992)), and therefore are not entitled to summary judgment on this issue. Accordingly, we summarily affirm that portion of the opinion below holding that summary judgment on the Lyonses' state law claims was inappropriate. Ind. Appellate Rule 58(A)(2).

**The Court of Appeals Correctly Rejected the Lyonses' Remaining Appellate Arguments.**

The Lyonses also challenge the trial court's grant of summary judgment to the defendants as to the federal claims, its grant of Indiana Insurance's motion to quash the third-party discovery requests, and its denial of the motion for leave to amend the complaint to add Indiana Insurance as a defendant. We believe the Court of Appeals correctly analyzed these issues. Lyons, 990

N.E.2d at 484–86.  Thus, we summarily affirm those portions of the opinion below affirming the trial court's rulings on these matters.  Ind. Appellate Rule 58(A)(2).

*     *     *

Finally, we note there has been some confusion as to how the trial court should proceed upon remand.  In its original opinion, the panel below suggested the application of the discovery rule was a question of fact for the jury, Lyons, 990 N.E.2d at 481, but upon rehearing, the panel stated it was rather a question of law for the trial court.  Lyons, 996 N.E.2d at 1280.  We agree on both counts.

The question of whether a plaintiff has complied with the requirements of the ITCA is one of law, Schoettmer v. Wright, 992 N.E.2d 702, 707 (Ind. 2013), but the answer may depend upon the resolution of disputed facts.  Gregor v. Szarmach, 706 N.E.2d 240, 241 (Ind. Ct. App. 1999).  And the application of the discovery rule necessarily involves questions of fact.  Wehling v. Citizens Nat'l Bank, 586 N.E.2d 840, 843 (Ind. 1992) (stating that whether the plaintiffs knew or "in the exercise of ordinary diligence" could have known of the defendant's alleged negligence was "a question of fact for the factfinder to answer").  When the discovery rule applies, the time for filing does not begin to run until the plaintiff knows or in the exercise of ordinary diligence should know of the tort.  Id.  Similarly, the application of the fraudulent concealment doctrine is a question of equity, but it may depend upon questions of fact, which are properly answered by the fact-finder.  Fager, 610 N.E.2d at 253 n.5 ("While the fraudulent concealment exception is an equitable doctrine, the relevant facts may be determined by a jury in the event of trial.").  When the doctrine applies, a plaintiff has a reasonable time after discovery of the tort to bring his action.  Id. at 251.

Such mixed questions of law and fact are best handled through carefully drafted jury instructions.  Douglass v. Irvin, 549 N.E.2d 368, 370 (Ind. 1990) (noting mixed questions of law and fact present "a difficult problem in the drafting of instructions" (quoting Clyde E. Williams &

11

Assoc., Inc. v. Boatman, 176 Ind. App. 430, 435, 375 N.E.2d 1138, 1141 (1978))).  The trial court may wish to consider something like this:

> Indiana law provides that a plaintiff must file a claim of negligence against a municipal defendant within 180 days after the defendant commits negligence.  There are a few exceptions to this general rule, and the Lyonses claim two of those exceptions in this case.
>
> To decide whether the Lyonses filed their claim within the required period of time, first, you must decide whether, and if so when, the defendants committed the act of negligence.
>
> Next, you must decide when a reasonable person would have discovered the act of negligence.
>
> If you decide that the Lyonses knew or in the exercise of ordinary diligence should have known of the negligence prior to July 15, 2009, you must decide in favor of the defendants.  But if not, the Lyonses filed this lawsuit within the required time period.
>
> Or, if the Lyonses prove by the greater weight of the evidence that (1) the defendants actively concealed an important fact with the intent to mislead or hinder the Lyonses from obtaining information about the negligence, and (2) the Lyonses filed this lawsuit within a reasonable time period after they discovered, or with reasonable diligence should have discovered, the negligence, then they filed this lawsuit within the required time period.
>
> But if the defendants prove by the greater weight of the evidence that the Lyonses did not file their lawsuit within the required time period, you must decide in favor of the defendants.[3]

Of course, we entrust the proper instruction of the jury to the trial court's sound discretion, Wal-Mart Stores, Inc. v. Wright, 774 N.E.2d 891, 893 (Ind. 2002), and our suggestion here is intended

---

[3] We crafted this instruction based upon the Indiana Model Civil Jury Instructions.  See Ind. Model Civil Jury Instructions, Instruction Nos. 1559 & 1561 (Ind. Judges Ass'n 2013).  Although these particular model instructions are intended for use in medical malpractice cases, we believe they may—with appropriate modification—be suitable in this context.

not as an expression of doubt or an imposition of a mandate but rather as an offer of guidance. We are confident the trial court will accept it in that spirit.

### Conclusion

We remand this case to the trial court for further proceedings consistent with this opinion.

Rush, C.J., and Dickson, Rucker, and David, JJ., concur.